IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KIMBERLEY A. ROBINSON,           :
                                   :
        Plaintiff,            :
                                   :
        v.                :
                                   :  CIVIL ACTION NO. 2:08-CV-01563
COUNTRYWIDE HOME LOANS, INC., BAC  :
HOME LOANS SERVICING LP, and BANK OF :  Honorable Nora Barry Fischer
NEW YORK AS TRUSTEE FOR THE       :
CERTIFICATEHOLDERS OF CWMBS 2005-R1 :
                                   :
        Defendants.      :
                                   :

## **MOTION TO COMPEL**

AND NOW, comes Plaintiff, Kimberley Robinson, by and through her attorney, Patrick J. Loughren, Esquire, and files the following Motion to Compel averring as follows:

## I.    **INTRODUCTION TO MOTION**

The current discovery dispute arises out of the non-production of three documents: the agreement between the defendants and the law firm that filed the foreclosure action against Ms. Robinson; (2) documents evidencing, with specificity, how the payments made by Ms. Robinson were applied and who got the money and (3) the W2 statements of the individuals who worked on her loan.

Defendants have raised attorney/client privilege with respect to the agreement. They have offered to produce the agreement for *in camera* inspection. While that is a nice gesture, which offer Plaintiff accepts, the agreement is nevertheless not attorney/client privileged and both the Third Circuit and the Pennsylvania Supreme Court

1

have so held. The objections to the latter two categories are wholly without merit and are the typical boilerplate objections made by parties intent on hiding the truth.

The Court is about to read a factual recitation wherein lawyers admit to the widespread unauthorized practice of law; where the defendants admit that false documents were filed in Ms. Robinson's bankruptcy; and where they admit to charging fees incurred by non-lawyers, and charges that are fanciful and pure fiction. The detailed factual recitation, while lengthy, is necessary background for the Court's ability to weigh the merit, or lack thereof, of the objections to Plaintiff's discovery.

## II.    FACTS

1.      This action was filed by Ms. Robinson in response to a foreclosure action filed against her in the Court of Common Pleas of Allegheny Count. The foreclosure action is currently "stayed" pending resolution of this action. In this action, Plaintiff asserts claims for breach of contract, tortious interference with contractual relations, violation of the UTP/CPL, and fraud.

2.      On December 17, 1999, Plaintiff, Kimberley Robinson (Hereinafter "Ms. Robinson"), entered into a mortgage with PNC Mortgage Corp. of America covering her home at 718 Penny Drive, Pittsburgh, PA 15235.

3.      PNC assigned the mortgage and note to Countrywide Home Loans, Inc. (hereinafter "CHL, Inc.")

4.      CHL, Inc. utilized Countrywide Home Loan Servicing, LP (hereinafter "Countrywide") as its loan servicer. Countrywide is now known as BAC Home Loan Servicing, LP. Plaintiff will refer to this entity as "Servicer" in this motion.

2

5.      In March 2005, CHL, Inc. and Servicer entered into a "Pooling and Servicing Agreement" with the Defendant, Bank of New York as Trustee for The Certificateholders of CWMBS 2005-R1 (hereinafter "Bank of New York").

6.      At the time the Pooling Agreement was consummated, Ms. Robinson's note was assigned to Bank of New York.

7.      Pursuant to the Pooling Agreement, Servicing agreed to continue to service the loan that had been assigned to Bank of New York.

8.      Although it had assigned the *note* to Bank of New York via the Pooling Agreement, CHL, Inc. held on to the *mortgage* and did not assign it away.

9.      Defendants admit that Plaintiff's mortgage was **not** in default in early 2006:

> Q.      At the beginning of 2006, Kim Robinson's mortgage was not in default, was it?
> A.      No.
> Q.      Meaning that's correct?
> A.      Correct. (CHLS, Inc. p. 56, lines 8-12)

10.     Unfortunately, as the year progressed, Ms. Robinson fell behind in her mortgage payments.

11.     In mid-2006, Ms. Robinson filed for bankruptcy in the Western District of Pennsylvania.

12.     CHL, Inc., which as of this time only held the mortgage but did not hold the note, hired the Philadelphia law firm of Goldbeck, McCafferty & McKeever, P.C., to appear in the bankruptcy action and obtain relief from stay. The firm obtained relief from stay, but in doing so filed a false document, as discussed more fully hereinafter (with citations).

3

13.     After relief from stay was effectuated, Plaintiff received a letter bearing the name "Countrywide Home Loans" dated November 15, 2006 which included a demand for $4,535.13 to bring the loan current. Included in this figure were various costs and fees associated with the bankruptcy. (Defendants don't know, or won't say, who sent the letter, so whether it was the Servicer or CHL, Inc. or someone else is not clear.)

14.     By November 2006, Ms. Robinson had been asking Defendants to give her a straight answer as to what she owed for several months.  When she received the November 15th letter, she did not feel that she owed what was being demanded. Nevertheless, Ms. Robinson mailed $4,535.14 via overnight mail on November 27, 2008.

15.     To her shock and dismay, she then received a letter dated November 29, 2006, by means of which the money was mailed back to her under cover letter that unintelligibly advised the money was either insufficient, or not in certified funds.  The letter was unintelligible because she had paid more than what had been requested, and the November 15th letter had not instructed that her payment be in certified funds.

16.     On December 20, 2006, Bank of New York filed a Mortgage Foreclosure action against Ms. Robinson in the Court of Common Pleas of Allegheny County.

17.     In the Foreclosure Complaint, Bank of New York admitted that Mrs. Robinson's mortgage and loan are FHA-guaranteed under Title II of the National Housing Act of 1934, as amended.

18.     Bank of New York was correct in alleging that the mortgage was governed by FHA regulations.  However, what the Bank overlooked (likely because the mortgage had not yet been assigned to it) is the fact that the mortgage contract specifically

precludes acceleration of the debt in the event that same if precluded by regulations promulgated by the Secretary of HUD:

> 9. Grounds for Acceleration of Debt
>
>> (d) Regulations of HUD Secretary. In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment default, to require immediate payment in full and foreclose if not paid. This Security Instrument **does** **not** **authorize** acceleration or **foreclosure** if not permitted by regulations of the Secretary.

19. When Bank of New York obtained the note at the time the "Pooling and Servicing Agreement" was executed, Bank of New York promised that it would comply with the National Housing Act of 1934. Section 8.13 of the Pooling and Servicing Agreement states: "In performing its duties hereunder with respect to FHA loans, the Trustee **shall** comply with all requirements of the National Housing Act of 1934 as amended." (emphasis added)(The Pooling Agreement defines the Trustee as Bank of New York.)

20. CHL, Inc., (which still held the mortgage at the time the foreclosure action was filed) admitted during its deposition, taken pursuant to Rule 30(b)(6), that in light of the fact that it was still the owner of the mortgage, it had the obligation to comply with the FHA regulations:

> Q. Because Countrywide held on to the mortgage after it assigned the note, do you agree that Countrywide Home Loans, Inc. had the obligation to treat its customer, Mrs. Robinson, in a manner consistent with the federal regulations governing FHA loans?
> A. Yes, sir. (CHL, Inc., p. 9, line 25 – p. 10, line 7)

5

21.     The Mortgage contract stipulates that the provisions in the document are binding on the successors and assigns of both Kimberly and PNC. Specifically, the PNC Mortgage states:

> 12.     Successors and Assigns Bound; Joint and Several Liability; Co-Signers. The covenants and agreements of this Security instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to [provisions not relevant here...]  (See PNC Mortgage, ¶ 12)

22.     The relevant FHA regulations are as follows: A mortgagee is required to have a face-to-face interview with the mortgagor, or to make reasonable efforts to arrange such a meeting, before three full monthly installments due on the mortgage are unpaid. 24 C.F.R. 203.604(b).  A face to face meeting is not required if a reasonable effort to arrange a meeting is unsuccessful.  24 C.F.R. 203.604(b)(5).  Such a reasonable effort to arrange a face-to-face meeting shall also include at least one trip to see the mortgagor at the mortgaged property and shall also consist at a minimum of one letter sent to the mortgagor certified by the Postal Service as having been dispatched." See 24 CFR § 203.604(d) The regulations also require the mortgagee to accept partial payments greater that 50% of the amount due.  See 24 CFR § 203.556.

23.     Defendants admit that they did not send a certified mail letter to Ms. Robinson in 2006, and thus admit to violating the FHA regulations and the Mortgage Contract:

> Q.     Countrywide Home Loans Servicing, LP did not send a letter via certified mail requesting a face-to-face meeting; is that correct?
> A.     In 2006?
> Q.     Yes, sir.
> A.     Yes, that's correct. (Servicer, p. 55, line 25 – p. 56, line 7)

24.     Defendants admit that they did not request a face-to-face meeting with Ms. Robinson in 2006, and thus admit to a second violation of both the FHA regulations and the mortgage contract:

> Q.      So my statement is a true and correct statement that Countrywide did not request a face-to-face meeting with Kim Robinson?
> A.      Yes, that's a correct statement. (Servicer, p. 55, lines 20-24)

25.     By their conduct in returning Mrs. Robinson's payment of more than what was requested of her (i.e. she paid one penny more than the $4,535.13 she had been asked to pay) Defendants admit that they did not accept a partial payment and thus admit to a third violation of the FHA regulations and the mortgage contract.

26.     In the Foreclosure Complaint, the Bank of New York *falsely* alleged that it had been assigned the mortgage. The truth is that the mortgage was not assigned to Bank of New York until July 26, 2007 which is the date the assignment was executed.

27.     Goldbeck, McCafferty & McKeever, P.C. is the name of the law firm on the Foreclosure Complaint. The general idea, if not the rule, is that when a law firm's name appears on a pleading, that firm represents the party on whose behalf the pleading is being filed.

28.     The deposition of the law firm Goldbeck, McCafferty & McKeever was taken pursuant to Fed. R. Civ. Pro 30(b)(6) on September 21, 2010. The individual who sat as the corporate designee was Gary McCafferty, Esquire, who is a named partner in the firm.

29.     Mr. McCafferty admitted his firm has never talked to the Bank of New York about Mrs. Robinson:

> Q.   Your firm has never even talked to the Bank of New York, the plaintiff in this case, about Mrs. Robinson?
> A.   To the best of my knowledge, no.
> Q.   Meaning I'm correct?
> A.   Yes. (Goldbeck Depo, p. 59, lines 6-11)

30.   Mr. McCafferty admitted that his firm has no fee agreement with the Bank of New York:

> Q.   Does the firm have any written fee agreement with the Bank of New York as Trustee for the Certificateholders of CWMBS 2005-R1?
> A.   To the best of my knowledge, no.
> Q.   What is that entity, if you know?
> A.   I do not have specific knowledge of that entity.
> Q.   Do you understand that your law firm purporting to represent that entity sued my client?
> A.   Yes.  (McCafferty., p. 46, line 16 – p. 47, line 1)

31.   Mr. McCafferty testified that the Goldbeck firm files **thousands** of mortgage foreclosure cases.

> Q.   And from my review of the dockets, which I have reviewed extensively, your firm files thousands of mortgage cases.  Is that consistent with your understanding of the activity your firm has?
> A.   Yes, that's correct.  (McCafferty, p. 65, line 21 – p. 66, line 1)

32.   Mr. McCafferty admitted that the firm only has ten attorneys but that it also has a staff of more than sixty non-lawyers.

> Q.   And in the non-paralegal category, legal secretaries?
> A.   We call them legal assistants.  They do work approaching paralegal work, but they're not -- they don't have the formal designation of a paralegal.
> Q.   The training and license?
> A.   Right.
> Q.   So you have paralegals.  How many paralegals do you have?
> A.   I would say 15 or 20.
> Q.   And how many legal assistants do you have?
> A.   40 or 50.  (McCafferty, p. 66, line 20 – p. 67, line 8)

33.     Mr. McCafferty admitted that it was a routine practice in 2006 for the firm to file foreclosure lawsuits that had **never** been reviewed by an attorney.   More significantly, he testified that the non-lawyers on staff at the firm wrote up the complaints, signed the lawyer's names to the documents, and filed the documents.  Most significantly, he admitted that the firm **authorized** the behavior:

Q.     Does the firm require its attorneys to review Complaints before they're filed, or are the Complaints filed by your administrative staff of paralegals and legal assistants without an attorney ever seeing the document?

A.     Well, I'd have to qualify that answer and say that complaints were filed **without an attorney seeing them**.

Q.     And when did that practice change?

A.     I couldn't give you an exact date, but it's been in the last couple of years.

Q.     Was it the practice in 2006 that Complaints could be filed without an attorney reviewing the Complaint?

A.     It could be, yes.

Q.     **Did the firm authorize** its administrative staff, which I'll just describe as non-lawyers, so inclusive of secretaries, paralegals, legal assistants, to sign attorneys' names to Complaints and file them, **knowing** that the attorney **had not** read the document?

A.     **Yes.**

Q.     Has that practice ended?

A.     Yes.

Q.     **Was that a practice in 2006?**

A.     I believe so. (McCafferty, p. 67, lines 9 – p. 68, line 10)

34.     Mr. McCafferty explained how his foreclosure mill obtains its cases so that non-lawyers can write them up and file them.  Cases come to the firm through the internet after which they are received by non-lawyers.  These non-lawyers then write complaints, sign lawyer's names to them, and file them:

Q.     Back in 2006, you've got cases coming through the computer to the web, where your staff would open them up, look at them, and file foreclosure cases.  Correct?

A.   Yes.

Q.   Some of which were looked at by a lawyer and **some of which weren't**. Correct?

A.   **Correct**.

Q.   Some of which were signed by a lawyer or some of which were signed by a **non**-**lawyer** signing the lawyer's name. Correct?

A.   Correct. (McCafferty, p. 75, line 18 – p. 76, line 5)

35.   Mr. McCafferty testified that his law firm did not even know what entity was sending these files to the firm for the purpose of filing the foreclosure actions:

BY MR. LOUGHREN

Q.   And so the plaintiff who sued my client had not had the mortgage assigned to it when it sued my client. Is that your understanding? Because my client was sued in 2006.

A.   My understanding was there was no assignment executed as of yet, at the time the Complaint was filed.

Q.   Do you know what legal right the Bank of New York as Trustee, etc., the plaintiff, had to sue my client in foreclosure? Since your firm filed the suit, I was wondering what does the firm believe was the bank's legal right to sue my client in foreclosure at that time in '06?

A.   Well, I believe, based on my client's instructions, that the named plaintiff was the real party in interest and the owner of the loan at the time the Complaint was filed.

Q.   The owner of the note?

A.   Yes.

Q.   Your client told you that?

A.   They told us who we should -- who the -- usually, how it's couched is who the investor is.

Q.   And is it the firm's understanding the investor is the owner of the right to sue --

A.   Yes.

Q.   -- in foreclosure?

A.   That's my understanding, yes.

Q.   So it's your client who tells you that information and your firm acts on that information and does -- puts the name as plaintiff that your client tells you to put in there?

A.   Correct.

Q.   And the **specific name of the client** who's telling you that, is it Home Loans, Inc., or is it Home Loans Servicing, L.P., or **do you even know**?

A.   **You know what, I don't know**.

> Q. Do you even know if the people who you communicate with are dual employees of those two names? It's the same people for both companies. Right?
> A. I don't know.
> Q. Did you ever read any of the provisions of the Pooling and Servicing agreement?
> A. In this case, no.
> Q. This was entered -- - just to identify it, it is an agreement dated March 1, 2005 between CWMBS Inc., Depositor, Countrywide Home Loans, Inc., Seller, Countrywide Home Loans Servicing, L.P., Master Servicer, and the Bank of New York, Trustee and Custodian. Have you ever heard of that agreement before?
> A. Of this specific agreement?
> Q. Yes, sir.
> A. No, I have not. (McCafferty p. 53, line 17 – p. 55, line 23)

36.     Joseph Goldbeck, Esquire is the lawyer whose name appears on the foreclosure action filed against Ms. Robinson. While the document *purports* to bear his signature, Mr. Goldbeck admitted that he did not sign his name to the foreclosure complaint.

> Q. Mr. Goldbeck, your name appears on a lawsuit that was filed against my client, Kim Robinson, that I've marked at the deposition of the designee of your firm moments ago. And I'd like to show you the document and ask you whether or not your signature appears on the document or whether the signature is someone else signing your name.
> A. That is **not my signature**. That was somebody signing my name. (Goldbeck, p. 7, line 23 – p. 8, line 8)

37.     Mr. Goldbeck cannot remember even looking at the foreclosure case that the non-lawyers in his firm filed against Mrs. Robinson:

> Q. Do you remember looking at Kim Robinson's case before it was filed?
> A. No. (Goldbeck, p. 12, line 24 – p. 13, line 2)

38.     Mr. Goldbeck agreed with the testimony of the 30(b)(6) witness, Mr. McCafferty, when he admitted that it was a widespread practice at Goldbeck, McCafferty

& McKeever in 2006 for non-lawyers to write up, sign and file complaints in foreclosure

in 2006 without lawyers ever seeing the documents:

> Q.  Mr. McCafferty just testified on behalf of the firm about practices
> that had been done that are no longer being done, and he testified
> that back in 2006 it may well have been the practice that
> foreclosure Complaints were being filed having been prepared by
> non-lawyer administrative staff, which included paralegals and
> legal assistants and legal secretaries, and they sometimes would
> sign Complaints and have them filed when **lawyers** **had** **not**
> **reviewed** the documents **at all**.  And he testified that that practice
> doesn't exist anymore at the firm.  Is that a fair – is that an
> understanding you have as well, that that practice existed back in
> 2006?
> A.  The **practice** **did** **exist** **in** **2006**.  I can't say what the practice is
> today.  (Goldbeck, p. 8, line 9 – p. 9, line 1)

39.    Mr. Goldbeck specifically admitted that in 2006 he personally authorized

non-lawyers to not only write up foreclosure lawsuits, but to sign lawyers' names to those

lawsuits and file those lawsuits without him ever seeing the document:

> Q.  Back in 2006, you were an active practicing lawyer at the firm?
> A.  Yes.
> Q.  And **did** **you** **authorize** individuals who were employed at the firm
> who were **not** **lawyers** to write up Complaints and sign your name
> to them and file them **without** you reviewing them?
> A.  **Yes**, I did.  (Goldbeck, p. 9, lines 9-10)

40.    One of the "costs" and/or "fees" that drove up the alleged debt that the

Defendants were demanding that Mrs. Robinson pay were attorney's fees and costs.  The

above testimony supports the conclusion that Ms. Robinson was being charged for the

services of non-lawyers who were practicing law without a license and billing themselves

out as lawyers.    The above testimony is similar to the below testimony, wherein the

Defendants admit that their lawyers filed false documents in the bankruptcy proceeding

in their successful bid to have the stay lifted proves that Mrs. Robinson:

Q.   Countrywide Home Loans, Inc. actively participated in the bankruptcy that Mrs. Robinson filed in 2006; correct?
A.   Correct.
Q.   Countrywide Home Loans, Inc. hired Goldbeck McCafferty & McKeever to represent it in the bankruptcy that Mrs. Robinson filed?
A.   Correct.
Q.   The lawyer was Ms. Puida; is that correct?
A.   I gave you that document back.
Q.   Here it is, yes, Leslie E. Puida, P-U-I-D-A; is that right?
A.   Yes, sir.
Q.   What is the title of the document you're looking at, the pleading there?
A.   Response of Countrywide Home Loans, Inc. to Debtor's Motion to Reconsider Relief Order.
Q.   And that's dated September 21, 2006; correct?
A.   Correct.
Q.   Do you agree that you and I today while you were in your capacity as another witness agreed that Paragraph 2 of that pleading is **inaccurate**?
A.   Correct.
Q.   Countrywide made an allegation that the mortgage, the payments were due from **May** of 2006 to the time of that document's filing in September when you and I have agreed that the payments were due from **June** until September; correct?
A.   That's **correct**.  (CHL, p. 6, line 22 – p. 8, line 7)


41.   The 30(b)(6) designee of the Servicer also admitted at deposition that the

bankruptcy filing that claimed payments were due from May – September was false due

to the fact that the payments were only due from June through September:

Q.   As of September 21, 2006, was the loan owed for May through September?
A.   From looking at the records, I saw it due for June through September.  May's was accounted for on the September 14 transaction.
Q.   Right.  So on that exhibit in your hand there, is that the paper that was filed in the bankruptcy court?
A.   Yes.
Q.   And that's dated September 21; correct?
A.   Yes, sir.
Q.   And in that it alleges in Paragraph 2 that the loan is owed from May until September; correct?

> A.     Correct.
> Q.     And you just confirmed that the May -- that the loan is owed from June until September?
> A.     That's correct, sir.  (CHLS, p. 100, line 10 – p. 101, line 5)

42.     One of the charges applied to Mrs. Robinson's loan were the attorney fees incurred for the Goldbeck lawyer to file a false document with the bankruptcy court.

43.     As set forth above, Ms. Robinson's loan and mortgage are governed by the FHA and the regulations promulgated by HUD.

44.     Despite the fact that the regulation specifically speaks to the issue of "partial payments", Mr. Goldbeck admitted that he was not aware of the FHA regulations relating to partial payments:

> Q.     Were you aware of the federal regulations that require the bank to accept the partial payments on FHA loans?
> A.     I can't say -- well, no, I wasn't.  (Goldbeck, p. 13, lines 15-18)

45.     In addition to admitting he did not bother to look to see whether the FHA regulations were complied with before he sued homeowners, Mr. Goldbeck also admitted that for many of the cases that were filed, he did not even bother to look at the case at all:

> Q.     Did you as an attorney take it upon yourself to tell your clients don't send me foreclosure cases that you want me to file without first making sure you've complied with the regulations that would be conditions precedent to filing the foreclosure case?
>
> MS. ANDERSON: Objection. It's privileged, but you can answer.
>
> THE WITNESS: I don't specifically recall telling them that.
>
> BY MR. LOUGHREN:
> Q.     Do you generally recall telling them that?
> A.     No.
> Q.     In your practice of law, did you rely on your client to make sure it complied with the regulations that it had to before they sent the files to you for foreclosure?

A.   Yes.  If I saw something that -- if I would see something that was
     improper or incorrect, I would certainly point that out to them.

Q.   Okay.  But **you wouldn't look** for regulations that were not
     complied with in every case that you filed?

A.   **No**.

Q.   And in some cases **you wouldn't even look at the case** before it
     was filed?

A.   **That's correct**.

Q.   **In a lot of cases**?

A.   **Yes**.  (Goldbeck, p. 11, line 19 – p. 12, line 23)

46.   One last factual area relevant to this motion deals with alleged costs that
were incurred in the servicing of this mortgage.  In her breach of contract action, Plaintiff
claims that she was bombarded with false and fraudulent charges.  The record supports
this allegation.

47.   The Defendants included costs for a "title search" performed by LandSafe,
which is a subsidiary of Countrywide, in the amount of $325.00:

Q.   I'm going to show you a document, CW 1007.  It's an invoice from
     LandSafe National Default Services.  Do you know LandSafe is
     one of your subsidiaries?

A.   Yes, sir.  (Servicer, p. 81, line 25 – p. 82, line 5)

48.   The LandSafe invoice, **which is dated November 15, 2006**, lists the
customer as "Joseph Goldbeck".

Q.   Now, this LandSafe invoice I'll hand to you, the date on that is
     what?

A.   11/15 of 2006.

Q.   And the customer is Joseph Goldbeck; right?

A.   Yes, sir.  (Servicer, p. 84, lines 2-7)

49.   This invoice is clearly fraudulent.  Countrywide admitted that it had not
even referred the case to the Goldbeck law firm as of November 15, 2006.  Countrywide
had no explanation as to how "Joseph Goldbeck" could be the customer on an invoice for

a foreclosure that had not even been referred to him as of the date of the invoice,

November 15, 2006:

> Q.   But this case wasn't even referred to Goldbeck until 11/27, was it?
> A.   No, sir, it was not.
> Q.   Meaning I'm correct, it was not referred?
> A.   Correct.
> Q.   So how can Joseph Goldbeck be requesting a title search when he hasn't even gotten the file yet; do you know?
> A.   No, sir, I don't know.  (Servicer, p. 84, lines 8-17)

    50.    Moreover, evidence also supports that the $325.00 charge was clearly

excessive.   Countrywide admitted that it had two prior title searches performed on

9/27/05 and 11/28/05 and that the costs for these searches were $150 and $100,

respectively.

    51.    Countrywide admitted that its subsidiary charges up to three times what

the other title searchers charge:

> Q.   I would like you to go down to 11/27/06 to the next title fees. That's your friends at LandSafe, isn't it?  You can see at the end of the entry LAND 26?
> A.   Yes, sir.
> Q.   What are they charging to do a title fee search?
> A.   There is a 325.
> Q.   $325; right?
> A.   Yes, sir.
> Q.   That's three times what the other folks are charging; right?
> A.   Yes, sir.  (Servicer, p. 94, lines 9-21)

    52.    Countrywide had no idea whether its subsidiaries charge of $325.00 for a

title search was fair:

> Q.   They are running a title search report for $325.  Does that sound like a fair charge for a title search?
> A.   I wouldn't know.  I have never ran a title search, so I can't say what's fair, what's not fair.  (CHLS, p. 82, lines 6-11)

53.    Although they were required to testify about payments on Mrs.

Robinson's loan account, the designee of the servicing company was unable to testify that

*any* money was paid to LandSafe:

Q.    Are you able to show me any check or wire that has been paid to
       LandSafe for $325?
A.    No, sir. (CHLS, p. 95, lines 19-21)


54.    The designee was also unable to testify that he had seen proof that

bankruptcy fees had been paid:

Q.    In fact, there is no evidence that anyone has paid the bankruptcy
       fees, is there?
A.    I haven't seen anything.

       MS. ANDERSON:  Objection.

Q.    Have you seen any evidence that anyone has paid the bankruptcy
       fees?
A.    No, sir. (CHLS, p. 95, lines 12-18)


## CATEGORY ONE DOCUMENTS

### Agreement Between Defendant and the Goldbeck Law Firm.

55.    Plaintiff subpoenaed the non-party law firm Goldbeck, McCafferty &

McKeever for deposition.    Plaintiff noticed the depositions of the three corporate

defendants.  Via *duces tecum*, she asked all witnesses to produce at the deposition the

Agreement(s) entered into between any defendant and the law firm Goldbeck,

McCafferty & McKeever.  Specifically, via request No. 4 in the subpoena *duces tecum* to

the Goldbeck law firm, Plaintiff asked the witness to produce:

4.    All written fee agreements between you and your clients
       relating to Bank of New York as Trustee for the
       Certificateholders of CWMBS 2005-R1 v. Kimberley A.
       Robinson, Allegheny County GD-06-030787 and In Re:

<u>Kimberley A. Robinson, Debtor</u>, United States Bankruptcy Court for the Western District of Pennsylvania Bankruptcy Number 06-22676-MBM.

And Plaintiff asked the Defendants to produce the following:

5.   All documents evidencing when you first contacted the law firm Goldbeck McCafferty & McKeever in order to retain said firm for the purpose of filing the mortgage foreclosure action against Ms. Robinson.

6.   The fee agreement between you and Goldbeck McCafferty & McKeever.

7.   The date and amount of all payments made by you to Goldbeck McCafferty & McKeever.

8.   All contracts between you and any co-Defendant that relate in any way to Kim Robinson and/or her mortgage.

56.   None of the witnesses produced any "fee agreement" or "contracts" existing between the Defendants and the Goldbeck law firm.  An agreement does exist, and a record was made that there is such a document.

57.   The asserted objection is that the document that the Defendants did identify is protected from disclosure by the attorney/client privilege.

58.   The Defendants have offered *in camera* review and the Plaintiff accepts that offer and hopes the Court will too.

59.   An *in camera* review, however, presumes that the defense has met its burden to implicate the attorney/client privilege, which they have not done.

60.   First, there is no question that the attorney/client privilege does not govern the Agreement with respect to Countrywide Home Loans, Inc. This entity **has admitted** that at the time the Agreement was entered into, it was **not** seeking legal advice from Goldbeck, McCafferty & McKeever, P.C.

18

BY MR. LOUGHREN

Q.  Was Countrywide Home Loans, Inc. seeking legal advice when they executed that agreement, or were they just retaining the lawyers, to your knowledge?

MS. ANDERSON:   Objection to the extent it calls for a legal conclusion as to what seeking legal advice is interpreted as by the courts, but you can answer.

A.  It seems like it's just the agreement to retain their services.
Q.  Everybody is telling each other what they're going to do as they go forward; correct?
A.  Correct.
Q.  Then **after** you hire them as lawyers, then you can seek their legal advice and legal services?
A.  **Correct**.  (CHLS, p. 11, line 23 – p. 12, line 16)

61.     Next, with respect to Bank of New York, the Agreement clearly cannot be protected by attorney/client privilege.  Aside from the fact that the law firm's designated witness testified that he has no idea who Bank of New York is, he also testified that the firm has never spoken to Bank of New York.  Moreover, the agreement (dated in 2003) **pre-dates** by two years Bank of New York's assumption of the note (March 2005) and it pre-dates Bank of New York's assumption of the mortgage (July 2007) by four years.

62.     The Agreement is dated February 2003.  (McCafferty, p. 14, lines 4-12)

63.     As of February 2003, Bank of New York as Trustee, had no relationship with Ms. Robinson, her note, or her mortgage.  The note was not assigned to Bank of New York until March of 2005, and the mortgage was not assigned to it until July of 2007.

64.     The Agreement that the defense is not producing cannot possibly be "attorney/client" privileged as between the Goldbeck firm and "Bank of New York as Trustee for the Certificateholders of CWMBS 2005-R1" and there is no testimony or law to support the assertion or application of the privilege.

65.     The defense lawyers for the bank in this case (i.e. Ballard Spahr) may argue that the foreclosure firm, Goldbeck, McCafferty & McKeever, became counsel for the Bank of New York pursuant to pursuant to the terms of the Pooling and Servicing Agreement entered into between Bank of New York and Countrywide Home Loans, Inc.

66.     However, Goldbeck, McCafferty & McKeever admitted that it has never read the 2005 Pooling and Servicing Agreement:

> Q.      Did you ever read any of the provisions of the Pooling and Servicing agreement?
> A.      In this case, no.
> Q.      This was entered -- - just to identify it, it is an agreement dated March 1, 2005 between CWMBS Inc., Depositor, Countrywide Home Loans, Inc., Seller, Countrywide Home Loans Servicing, L.P., Master Servicer, and the Bank of New York, Trustee and Custodian. Have you ever heard of that agreement before?
> A.      Of this specific agreement?
> Q.      Yes, sir.
> A.      No, I have not.  (Firm, p. 55, lines 10-23)

67.     The Goldbeck firm also testified that the Agreement the Defendants are hiding is not signed by either Countrywide Home Loans, Inc. or Countrywide Home Loan Servicing, LP:

> Q.      And who is it that executed the document?
> A.      Mr. Goldbeck.
> Q.      And who executed it on behalf of the Countrywide Home Loan, Inc., entity?
> A.      No one, as far as I can tell.
> Q.      Who executed the agreement on behalf of, if anybody did, Countrywide Home Loans Servicing, L.P.?
> A.      No one, as far as I can tell.  (Firm, p. 14, lines 13-21)

68.     Not every document is covered by the attorney/client privilege just because lawyers acted pursuant to the document.  Saying something is attorney/client does not mean that it is.  Here, the record controverts the claim of privilege.  The

objection to the production of the document pursuant to which the defendants admit

Goldbeck, McCafferty & McKeever was turned loose on the Plaintiff is meritless **on the**

**facts** since the Defendants cannot establish that they were seeking legal advice, but it is

also meritless **on the law**.

69.   The Commonwealth of Pennsylvania has codified the attorney client

privilege:

> In a civil matter counsel shall not be competent or permitted to testify to
> confidential communications made to him by his client, nor shall the client
> be compelled to disclose the same, unless in either case the privilege is
> waived upon the trial by the client. (*See* 42 Pa. C.S.A. §5928)

70.   Federal courts interpreting Pennsylvania law of attorney-client privilege

have stated:

> Under Pennsylvania law, the elements of attorney-client privilege are the
> following: (1) the asserted holder of the privilege is or sought to become a
> client; (2) the person to whom the communication was made is a member
> of the bar or court; (3) the communication relates to a fact of which the
> attorney was informed by his client without the presence of strangers for
> the purpose of securing primarily either an opinion of law or legal services
> or assistance in some legal proceedings, and not for the purpose of
> committing a crime or tort; and (4) the privilege has been claimed and not
> waived by the client. (*See* Constand v. Cosby, 232 F.R.D. 494, (E.D. Pa.
> 2006) (citing 42 Pa.C.S.A. § 5928; Rhone Poulenc v. Home Indem. Co.,
> 32 F.3d 851, 862 (3d Cir. 1994)).

71.   "The party resisting discovery also bears the burden of demonstrating the

applicability of an evidentiary privilege, such as the attorney-client privilege or the work-

product privilege, as a bar to discovery." McCrink v. Peoples Benefit Life Ins. Co., No.

Civ.A.2:04CV01068LDD, 2004 U.S. Dist. LEXIS 23990, 2004 WL 2743420, *1 (E.D.

Pa. Nov. 29, 2004) (citation omitted).

72.    The Third Circuit has stated, "Generally, the fee agreement between a

client and an attorney is not privileged". In re Grand Jury Investigation (Tinari), 631 F.2d

17, 19 (3d Cir. 1990).

73.    In Porter v. NationsCredit Consumer Disc. Co., 2004 U.S. Dist. LEXIS

13641 (ED Pa. 2004) Judge Newcomer stated:

> The Court has enough substantive information to rule on Defendants'
> request for information on, and documentation of, Plaintiff's fee
> agreements. The Third Circuit has held that, 'The attorney-client privilege
> does not shield fee arrangements.' Montgomery County v. Microvote
> Corp., 175 F.3d 296, 304 (3d Cir. 1999); see also In re Grand Jury
> Investigation, 631 F.2d 17 (3d Cir. 1980).  Moreover, 'the fee agreement
> letter does not come within the ambit of the work-product privilege.'
> Montgomery County, 175 F.3d at 304.

74.    Lastly, the Pennsylvania Supreme Court has held that fee agreements are

not protected by the attorney client privilege.  In Commonwealth v. Chmiel, 585 Pa. 547,

599; 889 A.2d 501, 531-532 (Pa. 2005) the Court stated:

> While the attorney-client privilege is statutorily mandated, it has a number
> of requirements that must be satisfied in order to trigger its protections.
> First and foremost is the rule that the privilege applies only to confidential
> communications made by the client to the attorney in connection with the
> provision of legal services. Slater v. Rimar, Inc., 462 Pa. 138, 338 A.2d
> 584, 589 (Pa. 1975).  We agree with the trial court that disclosure of a fee
> arrangement between an attorney and client does not reveal a confidential
> communication. See Montgomery County v. MicroVote Corp., 175 F.3d
> 296, 304 (3d Cir. 1999) (holding that a fee agreement letter is not
> privileged); In re Grand Jury Investigation, 631 F.2d 17, 19 (3d Cir.1980)
> (holding attorney-client privilege does not protect fee arrangements absent
> strong probability that disclosure would implicate client in criminal
> activity for which client sought legal advice); Slusaw v. Hoffman, 2004
> PA Super 354, 861 A.2d 269, 272-73 (Pa. Super. 2004) (holding that
> production of evidence from attorneys regarding meetings and telephone
> calls would not violate attorney-client privilege where it would not call for
> disclosure of confidential communications).

75.     Plaintiff fully expects that the defendants are going to blame their lawyers

at trial.  Indeed, the Servicer testified at deposition that Goldbeck's conduct of using non-

lawyers to file lawsuits was "wrong":

> Q.     Did Countrywide Home Loans Servicing, LP know that that law
>        firm was having nonlawyers write up, sign and file lawsuits in
>        foreclosure against people without ever having a lawyer read them
>        in 2006?
> A.     No, sir.
> Q.     Does Countrywide Home Loans Servicing, LP condone that type
>        of conduct?
> A.     No, sir.
> Q.     Why?
> A.     **That's wrong**.  No one should be posing to do something that their
>        experience or their qualifications don't allow.  (CHLS, p. 57, lines
>        12-24)

76.     Plaintiff has a right to discover the agreement with the law firm to

determine whether the terms of the agreement imposed upon the defendants – and not the

law firm – to ensure compliance with FHA regulations, and to ensure accurate data was

utilized in the suit (such as whether the mortgage was actually assigned, the amount of

fees, the amount of charges, etc.).  Ms. Robinson has sued the Servicer for tortious

interference with here contract.   Ms. Robinson claims that the Servicer tortiously

interfered with her contract by causing suit to be filed against her that was based on false

data and lies.  The agreement may contain information helpful to proving that claim, or it

may lead to the discovery of such evidence.  As the court is aware, the standard for

discovery is far more liberal than the standard for admissibility at trial.  Because the

witnesses were not permitted to testify about the agreement, Plaintiff requires that the

witnesses return for deposition on the agreement after it is produced.  Plaintiff's notice of

deposition specifically required the witnesses to be prepared to testify as follows:

> 5.      The date plaintiff's mortgage was referred to counsel, **the terms of the fee agreement with said counsel**, the date(s) and amount(s) billed by said counsel, and the date(s) and amounts paid to said counsel.

77.      The agreement may show what duties were agreed to, who was to do them, on behalf of what entity this law firm was operating, and what the costs, charges and fees. The Agreement may refer to FHA regulations. It may identify parties who were in control and who may be culpable for tortious interference. It possibility might show the volume of files that were being shipped to the law firm by these banks, making it impossible for ten lawyers to file them all.

78.      For the above reasons, Plaintiffs should be provided with the document pursuant to which the Goldbeck firm operated. If the Court determines that the Agreement is subject to the attorney/client privilege, Plaintiff requests the opportunity to brief whether any exceptions to the privilege apply, in particular, the crime-fraud exception and to also present the Court with evidence that the privilege has been waived. Plaintiff cannot make those arguments with specificity now, because the defense has withheld the evidence of the crimes, and the fraud, by hiding the documents relating to the payment of money, to which discussion now turns.

## CATEGORY TWO

### Proof of Payment Documents

79.      The second category of documents that were not produced were documents evidencing that payments were actually made by the various defendants to the parties to whom they claim they were made.

80.     At the deposition of Bank of New York, the designee claimed that he had

tried to find out the information but was unable to find it.  He also identified emails that

he sent documenting his efforts.  Plaintiff would like to ask that the Court order those

emails to be produced to the Court for in camera review.  The testimony is as follows:

Q.     The specific name of the company who you're testifying received
       this $300 payment is Bank of America Home Loan Servicing, LP?
A.     Yes, sir.
Q.     And that's April 20, 2006?
A.     Yes, sir.
Q.     What account do they deposit that check into?
A.     I **don't know**, sir.
Q.     Who owns the account that the check was deposited into?
A.     I don't **know**, sir.
Q.     Take a look at the Notice of Deposition Paragraph 2d.  I asked you
       to be able to tell me the payments made by Kim Robinson and/or
       on her behalf including D, the specific account into which the
       payment was deposited and the owner of said account.
A.     Are you referring to a specific bank account?
Q.     That's correct.
A.     I **don't have access** to that information.  I don't know.
Q.     Do you know who owns the account?
A.     **No**, sir.
Q.     What did you do to find out before coming here?
A.     I tried to reach out to our payment processing group and see if they
       had any information as to that.  They were also unaware of that
       information.
Q.     So when checks come into wherever they come into, nobody
       knows where they're put?
A.     They're just ran through the payment processing process, and
       they're applied to the account accordingly.

            MR. LOUGHREN:  Counsel, is there an explanation as to
            why the witness isn't prepared to answer that question?

            MS. ANDERSON:  The witness made the efforts to look
            into the areas of inquiry listed on your Deposition Notice,
            and he's prepared to testify about how payments were
            applied.  I'm not sure how this particular question has any
            relevance to the allegations in this case, so I'm not sure
            what exactly you're trying to get at; but he did make the
            effort to inquire into the process for how payments were
            received, and that's what he has done.

BY MR. LOUGHREN:
Q.      Who is it that you talked to, sir? Give me the name.
A.      Let's see.  It's been awhile now.  I really can't recall the exact
        name.

                MS. ANDERSON:  Do you need to look at your e-mails
                and stuff to be able to figure out who you asked?

THE WITNESS:  I think so.
Q.      Do you think so or do you think that you're saying you do because
        your counsel just told you to?
A.      No.  I would have to look into – I can't remember if it was either
        phone calls or via e-mail, but that's not information that I was able
        to obtain.
Q.      So when you got this Notice of Deposition and you saw what you
        had to testify about, you said hey, that's something I don't know
        anything about; right?
A.      Right.
Q.      And you said I better ask somebody; right?
A.      Correct.
Q.      And did you know who it was you were going to ask?
A.      I would have probably started with people I worked with in the
        past in payment processing, but I can't remember specifically who
        I reached out to for this specific question.  I really can't say
        specifically who.
Q.      Do you remember when you were doing this?
A.      It would have been when I first got assigned for this deposition, the
        middle parts of September or something like that.
Q.      Are we still in September right now?
A.      Yes, sir.
Q.      So it was within the last 20 or 30 days you were undertaking the
        effort to try to find out how to answer 2d on this Notice of
        Deposition; right?
A.      Yes, sir.
Q.      And you think that you might have issued some e-mails?
A.      It's very likely, yes, sir.
Q.      Can you remember issuing an e-mail?
A.      Given this time frame, sir, this isn't the only case I work or even
        looking into, so specifically I can't point a finger or anything on
        this loan for this particular issue or question.  I'm for sure I would
        have sent the e-mail or made a phone call.  I just can't remember or
        recall exactly what steps I took or to whom it was taken.
Q.      Whoever it is that responded to your inquiry came back and said
        apparently I can't tell you that?

A.     Yes.  All they do is run payments through our payment processing system or machine and payments are applied according to the payments that are billed or whatever is billed on the account or whatever is due on the account, and that's all they do is just post and apply payments.

Q.     Well, the money goes somewhere, sir.  You've got to appreciate that; right?

A.     Yes, sir.

Q.     Money comes out of Kim's bank account and goes into somebody else's; right?

A.     Right.

Q.     And this asks for you to be able to tell me where it goes?

A.     Right.

Q.     When the person that you were asking where does this money go said I can't tell you, what did you do?

A.     There was really nothing else I could do except for understanding that all their job is to do is apply payments accordingly.

Q.     Did you advise your counsel that you can't answer that and be prepared to testify about 2d?

        *MS. ANDERSON*:  Objection to the extents it calls for attorney-client privileged information, but I think clearly the witness is testifying as to his knowledge on that specific area, and that's clear from his testimony what he knows.

Q.     I would like you to **preserve** all of the e-mails that you have that you issued in relationship to your inquiry on how to answer No. 2d; okay?

A.     Okay.

Q.     I would like you to **print them** and **give them** to your counsel, please.

A.     **Okay**.  (BNY, p. 34, line 4 - 40, line 8)

81.     The designated witnesses for the other two defendants also had no idea where the money was deposited, or who owned the accounts (again, the same human being was produced as the witness for all three companies, even though three transcripts were made):

        (from the deposition of Countrywide Home Loan Servicing, LP)

        MR. LOUGHREN:     Counsel, maybe you can answer the question.  Why hasn't your client produced the documents that I subpoenaed?

MS. ANDERSON:     We have produced all the documents that we have been able to gather, and we have done a reasonably diligent search for those documents; and I will point out that there are copies of the invoices that were produced last week in that production that have a schedule showing that invoices were reviewed, amounts were paid.  This document doesn't show that, but if you look in the other invoices, you might see that.

MR. LOUGHREN:     Where are the documents showing where Kim Robinson's checks were deposited, what accounts and who owns them?

MS. ANDERSON:     **That I don't know**.

MR. LOUGHREN (to the witness)

Q.     I asked you when you were the Bank of New York, so I'll ask you now as Countrywide, LP, where are the documents showing the accounts that my client's money was deposited into?

A.     I don't have that information, sir.

Q.     Did you try to find it other than what you told me?

A.     Other than that, sir, no.

Q.     You don't know who owns the accounts that my client's money was put into, do you?

A.     No, sir.

Q.     So that's two witnesses who aren't able to answer that question. Knowing that you're going to be the Countrywide Home Loans, Inc. deponent in about ten minutes, would your answer be the same, you don't know who owns the accounts?

A.     Yes, sir.

Q.     And you don't know what the account number is or anything like that, do you?

A.     Yes, sir. (CHLS, p. 78, line 5 – p. 79, line 24)


82.     Plaintiff submits that Defendant, Bank of New York, has flat out admitted

that it made **no good faith effort** to find the documents.  The individual who Bank of

New York produced as a witness admitted he has never worked for Bank of New York:

Q.     And you have never worked for Bank of New York as Trustee; correct?

A.     No, sir.  (BNY, p. 7, lines 20-22)

83.     He admitted that he has never been to the offices of Bank of New York

> Q.     Have you ever been to the offices of Bank of New York as
>        Trustee?
> A.     No, sir.  (BNY, p. 7, lines 23-25)

84.     And he admitted that he has never talked to a human being who is employed by Bank of New York:

> Q.     Have you ever talked to a human being who is employed by Bank
>        of New York as Trustee?
> A.     No, sir.  (BNY, p. 8, lines 2-5)

85.     The witness testified that he actually works for Bank of America, NA. (BNY, p. 6, lines 8-13)

86.     Bank of America, NA, is the owner of BAC Home Loan Servicing, LP. Bank of America, NA, a least according to the New York Times and every other news agency in the country, just this past week agreed to stay foreclosure cases in more than twenty states across the country due to widespread fraud that has been uncovered.

87.     Plaintiff's discovery seeking documents tracing the receipt and deposit of the money, as well as the charges, fees and costs that are being claimed is clearly relevant and defendants should be required to produce the documents as well as a witness to testify about same.

88.     Undersigned counsel recalls reading an opinion authored by this Court in a case dealing with river boats where the court chastised a party for not producing documents under its "care, custody and control". In this case, since the Servicer is working on behalf of the Bank of New York, wouldn't it be the case that the holder of the note and mortgage (Bank of New York) should be able to direct the servicer of the

mortgage (BAC/Countrywide Home Loan Servicing) to get it the documents that it was required to produce at deposition?

## CATEGORY THREE

### W-2 Statements

89.     The third and final category of documents relate to Plaintiff's request that the corporate defendants produce the W-2 statements of the individuals who serviced the loan.

90.     Plaintiff, in her request, advised that the income earned can be redacted.

91.     Defendants failed to produce any W-2 statements.

92.     The 30(b)(6) witness did not even know the employment status of the woman who signed the verification to the foreclosure action filed against Ms. Robinson, and the dialogue on the record that followed his inability to answer simple questions that he was Noticed to appear and testify about explains why the Court should compel production of the W2 statements.  These defendants are hiding the true identity of the actors to make it impossible for Plaintiff to prove who was doing what:

> Q.     Does Amanda Farr work for Countrywide Home Loans, Inc., to your knowledge?
> A.     I don't recognize the name.
> Q.     F-A-R-R-A-R?
> A.     Oh, Amanda Farrar?
> Q.     Farrar.  I'm sorry.
> A.     I have heard of her name.  I don't personally know her.
>
> MR. LOUGHREN:  What is the reason why the W-2s aren't produced?

MS. ANDERSON: We don't think it's relevant, and we also think they are confidential[1]. We don't see what possible connection they have to this case.

MR. LOUGHREN: They show who is working for whom. Do you think that's relevant?

MS. ANDERSON: I don't see what relevance that has.

MR. LOUGHREN: **Will you stipulate** that all of the individuals who were handling this loan were agents, servants or employees of all three corporate entities?

MS. ANDERSON: I **can't** do that on the record right now, but I can say that the servicing entities' employees are acting as agents for the other two entities in regard to servicing the loan as the witness has testified.

93.    Defendants' objection to identifying who worked for who, by producing the W-2 statements, is meritless and the W-2 statements sought by Plaintiff should be ordered to be produced. Moreover, the partial stipulation that counsel did make does not solve the problem. Employees of CHL, Inc. may have been the actual actors and, if true, then CHL, Inc. can be held liable for the torts committed upon Plaintiff.

Respectfully submitted,

/s/ Patrick J. Loughren, Esquire
Patrick J. Loughren, Esquire
PA I.D. #80449
Loughren, Loughren & Loughren, PC
310 Grant Street
Suite 2800 Grant Building
Pittsburgh, Pennsylvania 15219
412-232-3530
Fax 412-232-3535
Attorney for the Plaintiff

---

[1] The suggestion that a W-2 statement – with the amount of compensation redacted – is highly confidential is preposterous. These defendants are trying to hide the fact of who these people worked for. If the Court agrees that the W-2 statements are "highly confidential", Plaintiff will agree to keep them as such.

## CERTIFICATE OF SERVICE

I hereby certify that I served upon the following a true and correct copy of the

foregoing **Motion to Compel** via ECF filing this 8th day of October 2010:


**Joel E. Tasca, Esquire**
**Ballard Spahr, LLP**
**1735 Market Street**
**51st Floor**
**Philadelphia, Pennsylvania 19103-7599**
**TASCA@ballardspahr.com**



Respectfully Submitted,



/s/ Patrick J. Loughren, Esquire
Patrick J. Loughren, Esquire
Attorney for Plaintiff
Loughren, Loughren & Loughren, P.C.
310 Grant Street
Suite 2800 Grant Building
Pittsburgh, Pennsylvania 15219
Telephone:  (412) 232-3530
Facsimile:  (412) 232-3535